Lawrence J. King, Esq., #120805
LAW OFFICES OF LAWRENCE J. KING
11 Western Avenue
Petaluma, CA 94952
Telephone:  707-769-9791
Fax:  707-769-9253
Email:  kingesq@pacbell.net

Attorneys for Plaintiff Anthony Luckey

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| ANTHONY LUCKEY,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br><br>CITY OF PORTERVILLE, and BRUCE SOKOLOFF,<br><br>　　　　　　　Defendants. | CASE NO.  1:23-cv-00551-ADA-BAM<br><br>PLAINTIFF'S THIRD AMENDED COMPLAINT FOR:<br>(1) RACE DISCRIMINATION IN VIOLATION OF TITLE VII,<br>(2) DEPRIVATION OF CIVIL RIGHTS IN VIOLATION OF 42 U.S.C SECTION 1983;<br>(3) RACE DISCRIMINATION IN VIOLATION OF THE CALIFORNIA CONSTITUTION;<br>(4) RACE DISCRIMINATION IN VIOLATION OF THE FEHA;<br><br>AND<br><br>PLAINTIFF'S DEMAND FOR A JURY TRIAL.<br><br>UNLIMITED CIVIL ACTION. |

NOW COMES PLAINTIFF **ANTHONY LUCKEY,** and files this his complaint, demanding a jury trial and alleging the following:

**INTRODUCTION**

1.　Plaintiff brings this suit to vindicate his rights, and the rights of all California employees, to work in an environment free from race discrimination.  Plaintiff's claim is that Defendants City of Porterville and Bruce Sokoloff discriminated against him on the basis of his

1 race and Sokoloff violated his right to associate with a member of another race.[1] Specifically,
2 Plaintiff's claim is that Sokoloff orchestrated a campaign to get Plaintiff fired after he learned
3 that Plaintiff, a Black man, and Officer Ana Moreno, a White woman, were in a romantic
4 relationship and cohabitating because he disapproved of interracial relationships; that Sokoloff
5 attempted unsuccessfully to engage Officer Moreno in a romantic relationship while he was her
6 supervising Sergeant, both prior to and during Officer Moreno's relationship with Plaintiff; that
7 upon learning of Plaintiff's relationship with Officer Moreno, Sokoloff engaged in efforts to
8 separate them; that Sokoloff gave a direct order to Plaintiff to cease co-habitating with Officer
9 Moreno; that Sokoloff initiated and conducted an investigation of Plaintiff ostensibly for a
10 pursuit incident; that similarly situated White officers who engaged in pursuits, including
11 pursuits involving officer misconduct, had received no discipline or formal reprimands nor were
12 the subject of any investigation; that Sokoloff's investigation resulted in Plaintiff's sudden and
13 immediate termination, without explanation; and that Sokoloff's actions against Plaintiff were
14 due to his strict beliefs regarding racial and ethnic purity – beliefs that Sokoloff espoused to
15 Officer Moreno on numerous occasions.

**PARTIES AND VENUE**

17    2.    Plaintiff was, at all times relevant herein, a resident of Tulare County, California
18 and a Porterville Police Department employee.

19    3.    The City of Porterville is Charter City, located in Tulare County California, which
20 is within the jurisdiction of this Court.

21    4.    Porterville Police Department ("PPD") is a Department of the City of Porterville.

22    5.    Plaintiff alleges on information and belief that Sokoloff was, at all times relevant
23 herein, employed by the Porterville Police Department and a resident of Tulare County.

24    6.    Plaintiff is informed and believes and upon such information and belief alleges
25 that each of the defendants herein was, at all times relevant to the action, an agent, employee,

---

[1] This Court dismissed with prejudice Plaintiff's claim that Defendant Sokoloff's conduct violated Plaintiff's right to *intimate* association, but not his right to associate with a member of another race.

2
PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

and/or co-conspirator of the remaining defendants and was acting within the course and scope of that relationship. Plaintiff is further informed and believes and upon such information and belief alleges that each of the defendants herein gave consent to, ratified, and authorized the acts alleged herein of each of the remaining defendants.

## JURISDICTION & VENUE

7. Jurisdiction is proper in this Court under 28 U.S.C. 1331 because two of Plaintiff's causes of action are based on federal statutes.

8. Venue is proper in this Court because some or all of the acts upon which Plaintiff bases his causes of action took place within the geographic jurisdiction of the United States District Court for the Eastern District of California, Fresno Division.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. Plaintiff timely filed a complaint with the United States Equal Opportunity Commission ("EEOC") and the EEOC issued Plaintiff a "right-to-sue" notice on January 12, 2023. The DFEH issued Plaintiff a "right-to-sue" notice on April 6, 2023.

## FACTUAL ALLEGATIONS

10. Plaintiff graduated from the Tulare-Kings Police Academy in February 2017.

11. In October of 2017, the Tulare County Sheriff's Office ("TCSO") hired Plaintiff as a Deputy Sheriff.

12. By 2019, the Tulare County Sheriff's Office identified Plaintiff as being a leader and a mentor for new officers. Accordingly, in August 2019, Plaintiff was provided special training, including Post-Certified Field Officer Training and an Interview and Interrogation course offered by the Post-Certified Behavior Analysis Training Institute ("BATI") to prepare him to be transferred in September 2019 to the Tulare Area Gang and Narcotics Enforcement Team ("TAGNET") Detective Unit. The BATI course and TAGNET assignment were not typically available to the average Patrol Deputy and were offered to Plaintiff in recognition of his exceptional performance and potential.

13.   In March 2020, Plaintiff attended and successfully completed SWAT School in Huntington Beach.

14.   During his time in TAGNET, Plaintiff was the lead investigator on several gang related violent crimes. He authored dozens of search and arrests warrants resulting in the execution and planning of those operations. He completed several gang packets, which are requested by the Tulare County District Attorney's Office for use in gang-related expert testimony. He also made dozens of entries as a SWAT operator on SWAT call-outs and SWAT operations.

15.   During his three years with TCSO as Patrol Deputy, TAGNET detective, and SWAT Team member, Plaintiff never received a verbal or written reprimand.

16.   In October 2020, Plaintiff voluntarily left his employment with TCSO to join PPD for financial reasons. After Plaintiff announced his decision, TCSO took the unusual step of maintaining Plaintiff's current assignment, schedule, and take-home unit privileges up until his final day, and giving him a "final send off" on his last shift - things not typically done when someone quits to join another local department. These actions reflect the exceptional level of high regard TCSO leadership had for Plaintiff.

17.   In November 2020, Plaintiff was hired as a full-time police officer by PPD. He had an abbreviated Field Training Officer period of only six (6) days due to the breadth of his experience.

18.   Over the course of his employment with PPD, from November 20, 2020 to September 25, 2021, Plaintiff made over 135 arrests, including 50 felony arrests, 25 DUI arrests, 45 narcotics arrests, and approximately 6 firearms recovered.

19.   In January 2021, Plaintiff began a relationship with Officer Ana Moreno, a White female PPD officer. They have since married and had a child.

20.   Sokoloff belongs to the Russian Molokan religious sect. The Molokan sect has a well-documented history of espousing Russian exceptionalism, racial/ethnic "purity," and the belief that racial inter-marriage is wrong. Sokoloff adopted and agreed with these positions held

1  by the sect, as evidenced by numerous statements he made to Officer Moreno during the course
2  of her employment while he was her supervisor. Sokoloff explained that his religion is very
3  strict, and has very strict ideas about race, color, and genetics. He told her at various times things
4  like, "You gotta keep the bloodlines clean," and "You don't mix with other races." He described
5  his beliefs in "purity" when it comes to blood, that whiteness was "pure" and therefore better and
6  this extended to the color of people, and that "Russian purity" was superior to everyone else.
7  Sokoloff never hid his racist views from anyone at PPD, and in fact his racism was well-known
8  throughout the Department.

9     21.     On February 1, 2021, Detective Pinheiro contacted Officer Moreno and said he
10 had heard from someone outside of the PPD that she and Plaintiff were dating.

11     22.     On or around February 23, 2021, Officer Moreno informed Plaintiff that she
12 believed Sokoloff was aware of their relationship.

13     23.     On or around March 9, 2021, Officer A. Hernandez, a White officer, was involved
14 in a pursuit. He advised dispatch he was not pursuing, despite having his siren activated and
15 continuing to provide updates as the suspect vehicle continued to speed and run red lights.
16 Sergeant Sokoloff terminated the pursuit; however, no disciplinary action was taken.

17     24.     On or around March 18, 2021, Plaintiff formally notified his supervisor, Corporal
18 Vargas and therefore the Department, of his relationship with Officer Moreno.

19     25.     On or around April 23, 2021, PPD Officer Sanders and Officer Scott, both White
20 officers, were involved in a pursuit. <u>The pursuit continued after being terminated by the shift
21 supervisor.</u> The pursuit ended with the suspect vehicle being involved in a traffic accident and
22 the suspect was later taken into custody. Neither officer received any form of discipline.

23     26.     On or around April 27, 2021, Plaintiff was involved in a pursuit. He was assigned
24 to a detail with Corporal Benas to provide security for extracted marijuana plants that were
25 pulled from a warehouse earlier in the day. Plaintiff and Corporal Benas were parked facing the
26 roadway and observed a vehicle fail to stop at an intersection at approximately 100 MPH.
27 Corporal Benas (Plaintiff's direct supervisor) told Plaintiff to "Go get it." Plaintiff caught up to
28

the vehicle and initiated a traffic stop, in which the vehicle yielded. As Plaintiff exited his patrol unit, the suspect vehicle sped off. Plaintiff engaged in a pursuit and self-terminated the pursuit after the vehicle continued to drive recklessly. The vehicle later crashed and the suspect fled from the vehicle on foot and was ultimately apprehended. Sergeant Sokoloff arrived on scene and stated to Plaintiff that he was mad that Plaintiff did a traffic stop while he was assigned on a detail, despite being given an order by his direct on-scene supervisor to "go get it."

27. On or around April 27, 2021, Lieutenant Standridge requested to speak with Plaintiff outside of the police department. Lieutenant Standridge was the supervisor in charge of the General Detectives, Special Investigations, and Narcotics Unit. Standridge told Plaintiff that he badly wanted Plaintiff to be in the unit due to Plaintiff's training and experience and proactive attitude. Standridge asked Plaintiff how he felt about that, and Plaintiff responded that he would be more than happy to be in the unit.

28. On or around April 29, 2021, Plaintiff was served with a letter of intent for an Internal Investigation initiated by Sokoloff regarding the April 27, 2021 pursuit, despite the fact that his on-scene supervisor had given him a direct order to pursue the vehicle.

29. On or around May 13, 2021, Plaintiff asked Officer N. Bray what Plaintiff had done to receive the disparate treatment he was receiving within the police department. Officer Bray stated it was due to Plaintiff dating Officer Moreno and certain persons being jealous.

30. That same day, Plaintiff spoke with Sergeant Dominguez who stated he had spoken with Lieutenant Standridge regarding the upcoming detective movements, and that the plan was to move Plaintiff to SIU as soon as Officer Rodriguez' assignment was terminated.

31. On or around May 14, 2021, Officer R. Machiche, a White officer, was involved in a pursuit. Officer Machiche stated the reason for his stop was due to his incorrect belief that the vehicle was stolen. Dispatch confirmed the license plate was not stolen and the plate returned back to the same year, make, and model of the vehicle being pursued. The pursuit was allowed to continue for a short time with permission of his sergeant. The pursuit was ultimately terminated,

and the suspect was not apprehended. No disciplinary action was taken against Officer Machiche.

32. On or around May 31, 2021, Officer Perez told Officer Moreno, "Since you started dating Luckey I noticed [Sokoloff's] meaner to you." Officer Moreno responded that she agreed and had noticed it, too.

33. On or around June 11, 2021, Captain Barteau came into the report writing room and asked Plaintiff if he had received a Personnel Incident Report ("PIR") recently. Plaintiff replied that he had not. Capt. Barteau said, "It's coming. Just know we really like the work you're doing and this isn't a reflection of you. We just had to get some stuff in order. Keep up the good work."

34. Later that same day, Captain (now Chief) Castellow stopped Plaintiff in the hallway and told him that Plaintiff reminded him of himself. Castellow assured Plaintiff that he did not have anything to worry about. He instructed Plaintiff to start looking at "the bigger picture" as far as promoting, and repeated that Plaintiff will be just fine.

35. On or around July 7, 2021, Officer Bray, a White officer was involved in a pursuit. No disciplinary action was taken.

36. On August 16, 2021, Sokoloff was promoted to the position of Lieutenant with the PPD.

37. On August 18, 2021, while Plaintiff was staying with Officer Moreno during the week at her house on a regular basis, Officer Moreno fell ill at work and was ordered to get tested for COVID. Plaintiff drove Officer Moreno to get tested, as she was too ill to go alone. Officer Moreno tested positive and Plaintiff tested negative. Upon receiving news of the results that day, Sokoloff ordered Plaintiff to cease cohabitating with Officer Moreno, ordered him to relocate to his residence in Tulare, and ordered him to not have any contact with Officer Moreno. No other married or cohabitating couples employed by PPD were ordered to live separately and have no contact if one tested positive with COVID. Plaintiff had been living with Officer

1 Moreno with the knowledge of the Department prior to her testing positive, and therefore
2 enforcing quarantine at that point would have had little practical effect.

3     38.    Plaintiff felt angry and helpless in being ordered by Sokoloff to cease providing
4 care, comfort, and company to his partner while she was seriously ill with COVID. Plaintiff felt
5 that Sokoloff was using his new power and position as Lieutenant to interfere with,
6 inconvenience, and separate him from Officer Moreno.

7     39.    On August 20, 2021, PPD Human Resources countermanded Sokoloff's order
8 and permitted Plaintiff to return to Officer Moreno's house and finish his quarantine there.
9 Plaintiff never tested positive for COVID and completed quarantine on September 3, 2021.

10     40.    On September 4, 2021, Detective Vargas sent Plaintiff a text saying, "How the
11 fuck aren't u in detectives?" Plaintiff asked him why he asked, and Detective Vargas replied
12 "Cause you should have gotten it the last time around. You know how to roll with CIs and know
13 how to roll with the info."

14     41.    On or around September 9, 2021, Sergeant Martinez complimented Plaintiff while
15 on a break at a training. Sgt. Martinez said he was telling his team that he does not understand
16 "how one guy (Plaintiff) on an almost daily basis can get all kinds of guns, taking cars, making
17 solid arrests, but the team doesn't do anything." Sgt. Martinez said he was talking Plaintiff up to
18 the PPD administration, and added that lazy people really bother him and to continue doing what
19 Plaintiff was doing

20     42.    On September 30, 2021 at approximately 6:00 p.m., Sokoloff requested that
21 Plaintiff report to Captain Maniss' office. Plaintiff believed at the time the meeting was possibly
22 to discuss being moved to a detective position. After Plaintiff entered the office, Captain Maniss
23 stated, "I'm sorry to be the one to tell you this but we are terminating your employment with us."
24 Maniss handed him a letter which stated only that Plaintiff had failed "to meet the standards and
25 conduct of a Probationary Police Officer." Plaintiff understood from Capt. Maniss' statement of
26 genuine remorse and his behavior that Maniss believed the termination was improper and
27
28

1  unjustified but was going along with it. Plaintiff was in shock and disbelief; he did not ask any
2  questions or make any statement, but signed the letter, turned in all of his gear, and left the PPD.

3        43.    Upon word getting out within the PPD, Plaintiff immediately received an
4  onslaught of texts from officers, corporals, and sergeants expressing shock, confusion, and anger.
5  Most of them asked Plaintiff, "What happened?" and appeared to be as blind-sided as Plaintiff.

6        44.    On September 31, 2021, the day after Plaintiff's termination, Officer Moreno was
7  directed to report to Sokoloff, who had come in on his day off just to meet with her. He was
8  alone in his office and asked her why she had not called him to ask what had happened and why
9  Plaintiff was fired the previous day. He then informed her that he was the one who had
10 conducted the investigation the resulted in Plaintiff's termination, and said he felt that he needed
11 to tell her directly that he was responsible for the termination rather than her hearing it from
12 someone else. He said he could not tell her what the reason was, and Officer Moreno responded
13 that she had not asked for a reason and did not need to know the reason. He told Moreno that she
14 could have a very successful career and added that he was "very influential within the
15 administration," and now that he was a Lieutenant, he could "be a big influence in the
16 Department" because of his close friendship with Captain Barteau.

17       45.    In February 2022, Plaintiff contacted Sgt. Brett Calloway, who was no longer
18 with PPD. Plaintiff asked if now that neither of them was employed by PPD, Calloway could tell
19 Plaintiff the reason he was fired. Calloway stated, "A certain Lieutenant had feelings for your
20 girlfriend."

**FIRST CAUSE OF ACTION: RACE DISCRIMINATION
IN VIOLATION OF TITLE VII
(Against Defendant City of Porterville)**

23       46.    Plaintiff incorporates herein the allegations set forth above.

24       47.    Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of a
25 person's race.

26       48.    Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of a
27 person's race.  Moreover, EEOC decisions consistently have held that an employer who takes
28

9

adverse action against an employee because of interracial association violates Title VII.[2]

49. As more fully described above, Plaintiff is Black and a member of a protected class; was highly qualified for his position. He was disciplined by Sokoloff as a result of a pursuit that he was ordered to engage in by his direct on-scene supervisor; and at least five (5) similarly situated officers who were outside of Plaintiff's protected class (i.e. were White or White/Hispanic) engaged in similar pursuits, with one even making false statements to Communications that he was not in pursuit when he in fact was while Defendant Sokoloff listened in and ordered the pursuit to be terminated, yet none of these other officers received any reprimand or discipline. Ultimately, Plaintiff was terminated as a result of an investigation initiated and conducted by Sokoloff.

50. Sokoloff also discriminated against Plaintiff based upon his race by causing his termination because he opposed inter-racial relationships, believed that "you gotta keep the bloodlines clean," and wanted to separate Plaintiff from the White female officer Plaintiff was in a relationship with (who later became his wife).

51. Defendant City of Porterville is strictly liable for Sokoloff's illegal conduct due to the fact that he used his position as a supervisor to get Plaintiff fired.

52. As a result of Defendant's violations of Title VII of the Civil Rights Act, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to his health and personal and professional reputations.

**SECOND CAUSE OF ACTION: DEPRIVATION OF CIVIL RIGHTS IN VIOLATIONS OF 42 U.S.C SECTION 1983**
**(Against Defendant Sokoloff)**

53. Plaintiff incorporates herein the allegations set forth above.

54. 42 U.S.C. section 1983 creates a private right of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or

---

[2] *See e.g. Roule v. Petraeus* (N.D. Cal., Nov. 28, 2011, No. C 10-04632 CW) 2011 WL 5914025, at *4.

other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

55.     As described more fully above, Defendants deprived Plaintiff of rights secured to him by the Constitution and federal statutes while acting under color of state law, by intentionally discriminating against him on the basis of his race because he learned that Plaintiff was romantically involved with a White female PPD officer and he disapproved of interacial relationships. In doing so, Defendants denied Plaintiff his right to work in environment free of race discrimination as secured to him by the First and the Fourteenth Amendment to the United States Constitution and Title VII of the Civil Rights Act of 1964. Defendant Sokoloff's unconstitutional conduct was performed under color of law and was known and ratified by the authorized policymaker in the supervisory position above him, Captain Maniss. Plaintiff's right to work in environment free of race discrimination as secured to him by the United States Constitution, was clearly established at the time that Defendants violated those rights.

56.     As a result of Defendants' violations of the section 1983, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to his health and personal and professional reputations.

**THIRD CAUSE OF ACTION: RACE DISCRIMINATION
IN VIOLATION OF THE CALIFORNIA CONSTITUTION
(Against Defendant City of Porterville)**

57.     Plaintiff incorporates herein the allegations set forth above.

58.     Article 1, Sections 8 & 31 of the California Constitution prohibits race discrimination, including the termination of employment on the basis of a person's race.

59.     As more fully described above, Plaintiff is Black and a member of a protected class; was highly qualified for his position; was terminated from that position as a result of a pursuit that he was ordered to engage in by his direct on-scene supervisor; and at least four (4) similarly situated officers who were outside of Plaintiff's protected class (i.e. were White or White/Hispanic) engaged in similar pursuits, with one even making false statements to

Communications that he was not in pursuit when he in fact was while Sokoloff listened in and order the pursuit to be terminated, yet none of these other officers received any reprimand or discipline.

60. Sokoloff discriminated against Plaintiff based upon his race by causing his termination because he opposed inter-racial relationships, believed that "you gotta keep the bloodlines clean," and wanted to separate him from the White female officer he was in a relationship with (who later became his wife).

61. Defendant City of Porterville is strictly liable for Sokoloff's illegal conduct due to the fact that he used his position as a supervisor to get Plaintiff fired.

62. As a result of Defendant's violations of the California Constitution, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to his health and personal and professional reputations.

**FOURTH CAUSE OF ACTION: RACE DISCRIMINATION
IN VIOLATION OF THE FEHA
(Against Defendant City of Porterville)**

63. Plaintiff incorporates herein the allegations set forth above.

64. California's Fair Employment and Housing Act ("FEHA"), California Government Code Section 12900, *et. seq*., prohibits discrimination on the basis of a person's race.

65. As more fully described above, Plaintiff is Black and a member of a protected class; was highly qualified for his position; was terminated from that position as a result of a pursuit that he was ordered to engage in by his direct on-scene supervisor; and at least four (4) similarly situated officers who were outside of Plaintiff's protected class (i.e. were White or White/Hispanic) engaged in similar pursuits, with one even making false statements to Communications that he was not in pursuit when he in fact was while Sokoloff listened in and order the pursuit to be terminated, yet none of these other officers received any reprimand or discipline.

66. As more fully described above, Sokoloff discriminated against Plaintiff based upon his race by causing his termination because he opposed inter-racial partnerships, believed that "you gotta keep the bloodlines clean," and wanted to separate him from the White female officer he was in a relationship with and who later became his wife.

67. Defendant City of Porterville is strictly liable for Sokoloff's illegal conduct due to the fact that he used his position as a supervisor to get Plaintiff fired.

68. As a result of Defendant's violations of the FEHA, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to his health and personal and professional reputations.

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. For lost compensation and related employment benefits, past and future, according to proof;

B. For special damages according to proof;

C. For compensatory damages for mental and emotional distress;

D. For reasonable costs and attorney's fees;

E. For prejudgment interest from the date of Plaintiff's discharge;

F. An injunction requiring the City of Porterville to reinstate Plaintiff to a position to which by now he would have been promoted but for the discrimination to which he was subjected and to revise its policies and practices to eliminate the hostile and discriminatory culture at the Porterville Police Department and to institute a fair and non-discriminatory promotion process.

G. The appointment Special Master or Monitor to ensure the City of Porterville carries out the orders of this Court;

H. For such other and further relief that the Court may deem just and proper.

Dated: November 9, 2024						Respectfully submitted,

							LAW OFFICES OF LAWRENCE J. KING


							By: ___/s/_____
							      Lawrence J. King